IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                        No. CR-08-2663 MV

TIMOTHY JOHN GRAY WOODRUFF,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Timothy John Gray Woodruff's Motion to Suppress Physical Evidence and Statements [**Doc. No. 26**], filed January 8, 2009. On March 4, 2009, the Court held a hearing and at the conclusion of the hearing took the matter under advisement. The Court, having considered the evidence presented at the hearing, the briefs submitted by the parties, and being otherwise fully advised, finds that Defendant's motion is not well taken and will be **DENIED.**

**FACTUAL BACKGROUND**

On August 1, 2008, at approximately 6:30 p.m., Defendant entered the U.S. Border Patrol checkpoint on Highway 70, West of Alamogordo. At that time, U.S. Border Patrol Agent Phillip Rocha was on duty at the primary inspection area. Before Agent Rocha had a chance to greet Defendant or ask him his citizenship, Defendant immediately initiated the conversation. Defendant spoke very rapidly and shuffled papers towards Agent Rocha. Defendant spoke so rapidly that Agent Rocha could not "get a word in edgeways." Defendant told Agent Rocha that he was not sure if he was going the right way and that he was going to be late for a wedding. Agent Rocha asked Defendant if he was a United States citizen but Defendant did not respond. Instead he continued to dominate the conversation as he shuffled his papers and complained that he was missing some pages.

Agent Rocha recognized the papers as printouts from Mapquest.

When Agent Rocha asked Defendant his citizenship a second time, Defendant replied that he was a United States citizen. As Defendant answered the question, Agent Rocha noticed that "he kept shuffling himself inside his seat." Next, Agent Rocha asked Defendant where he was coming from. Defendant replied that he was coming from California but then he redirected the conversation back to whether or not he was going the right way. He stated that he was trying to get to the "Rio Rancho Casino." This struck Agent Rocha as "odd" because anyone going to a casino through the route that Defendant was taking would be going to casinos in Ruidoso and Agent Rocha knew that there were no casinos in Ruidoso with the name "Rio Rancho Casino." Agent Rocha had heard of Rio Rancho, New Mexico, but he wasn't aware of a casino called the "Rio Rancho Casino." Agent Rocha testified that if Defendant was going to a casino in Rio Rancho, he was "not on the right road."

As Defendant was talking about the casino, Agent Rocha looked around the outside of the vehicle to verify where the plates were from and he saw that they were California plates. He then asked Defendant if he owned the vehicle and Defendant stated that he did not and that it was a rental. Agent Rocha thought that the vehicle was in bad condition for a rental. It did not look like any rental vehicle he had seen before.[1] It was an older model vehicle and it was missing a speaker.[2]

---

[1] Defendant's Exhibits B and C indicate respectively that the front and back license plates contained information identifying the car as a rental vehicle. Nonetheless, Agent's Rocha's testimony that he did not believe the vehicle was a rental was credible in light of the factors he articulated.

[2] The Court did not find Agent Rocha's testimony that he observed torn seats in the vehicle at the time of the initial encounter to be credible. Defendant's Exhibit E is a photo of a large tear on the lower side of the driver's seat. Agent Rocha stated on cross-examination that he could "not recall" whether there was only one tear in the vehicle. In addition, on cross-examination he stated that he could "not recall" whether he could see the tear depicted in Defendant's Exhibit E from his vantage point. The location of the tear clearly indicates that it was highly unlikely that Agent Rocha could have observed the tear from his vantage point. Rather, his testimony on direct examination regarding the torn seats appears to have been an after-the-fact justification to bolster the quantum of

He also noticed a battery pack for charging the vehicle's battery on the floor. For these reasons, he did not believe it was a rental vehicle and consequently asked Defendant for the rental agreement. Defendant stated that he did not have the agreement. Agent Rocha then asked Defendant for permission to conduct a canine inspection and Defendant "agreed."[3] At that point, Agent Rocha referred Defendant to the secondary inspection area so that a canine inspection could be conducted. Approximately two minutes elapsed between the time Defendant pulled into the primary inspection area and the time he consented to the canine inspection and was referred to the secondary inspection area.

Prior to Defendant's referral to the secondary inspection area, Border Patrol Agent Matthew Johnson had witnessed the encounter between Defendant and Agent Rocha and he was able to hear some of the conversation. Agent Johnson specifically heard Agent Rocha ask Defendant for consent to conduct a canine inspection and heard Defendant give his consent. After Defendant was referred to the secondary inspection area, Agent Johnson approached the vehicle and asked Defendant to step outside the vehicle and to take a seat on a bench located to the side of the secondary inspection area. As Defendant got out of the car and took a seat, Agent Johnson retrieved his canine partner Lisa. They approached the vehicle from the back, beginning at the left rear tail-light section. Lisa immediately alerted to that area of the vehicle. Agent Johnson continued to direct Lisa counter-

---

suspicious circumstances, rather than reflecting a factor that Agent Rocha actually took into consideration at the time of the stop.

[3]There was an inconsistency in Agent Rocha's testimony as to the precise wording of his question and whether he asked Defendant "can we run a canine inspection?" as opposed to "do you mind if we run a canine inspection? Agent Rocha clarified that he asked Defendant: "can we run a canine inspection on your vehicle? And his response was yes." The record is clear that Agent Rocha asked and was granted permission to conduct the canine inspection of the vehicle. Moreover, Agent Matthew Johnson who was also present during the checkpoint stop collaborated Agent Rocha's testimony that Agent Rocha asked for permission to conduct a canine inspection and Defendant consented.

clockwise around the outside of the vehicle and when they reached the driver's side of the vehicle, Lisa alerted again. Agent Johnson then asked Defendant for permission to place Lisa inside the vehicle and Defendant consented. Agent Johnson put Lisa in the vehicle and she alerted again. Agent Johnson testified that he had been working with Lisa for approximately nine months at the time of the checkpoint stop, and that he was familiar with Lisa's behaviors and her alerts. He further testified that he had no doubt that she alerted to the vehicle.

Agent Johnson estimated that approximately four minutes elapsed between the time Defendant entered the checkpoint and the time Lisa alerted to the presence of drugs.

After Lisa alerted inside the vehicle, Border Patrol Agent Lefand asked for consent to perform a hand search of the vehicle. Defendant consented to the search. Upon searching the vehicle, agents discovered methamphetamine concealed within coffee grounds in the back left-hand portion of the trunk.

After the methamphetamine was discovered, Defendant was arrested. During processing, checks were run on the vehicle. The checks indicated that the vehicle was registered with a rental company. In addition, although a rental agreement was never found in the vehicle, a rental agreement between Defendant and the rental company was subsequently obtained from the rental car agency.

## **DISCUSSION**

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend IV. It is well-settled that although the stop of a vehicle at a fixed border patrol checkpoint constitutes a "seizure" within the meaning of the Fourth Amendment, *see United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998), border patrol agents may briefly detain

and question a person at a fixed checkpoint without any individualized suspicion that the person is engaged in criminal activity. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976); *United States v. Massie*, 65 F.3d 843, 847 (10th Cir. 1995). "The principle protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Martinez-Fuerte*, 428 U.S. at 566-67; *see also United States v. Rascon-Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993).

"A routine checkpoint stop must be brief and unintrusive." *Rascon-Ortiz*, 994 F.2d at 752. During a routine fixed-checkpoint stop, border patrol agents may inquire into an individual's citizenship or immigration status and request documentation. *See Massie*, 65 F.3d at 847-48. They may also make a cursory visual inspection of the vehicle and may briefly question an individual "concerning such things as vehicle ownership, cargo, destination, and travel plans," provided that such questions are "reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband." *Rascon-Ortiz*, 994 F.3d at 752; *accord Massie*, 65 F.3d at 848.

In addition, "if an agent observes 'suspicious circumstances' [during a routine stop] the agent may briefly question the motorist concerning those suspicions and ask the motorist to explain." *United States v. Sanders*, 937 F.2d 1495, 1500 (10th Cir.1991), *cert. denied*, 502 U.S.1110 (1992). The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances. *United States v. Johnson*, 895 F.2d 693, 696 (10th Cir.1990). In determining whether suspicious circumstances exist, courts apply "a common sense view of the totality of the circumstances." *Sanders*, 937 F.2d at 1501. "[S]ome deference is properly given to border patrol agents who . . . are specifically trained to look for indicia of crime, with an emphasis on immigration

and customs laws." *Id. at* 1500.   So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts. *Id.*

Border patrol agents have "virtually unlimited discretion to refer cars to the secondary inspection area," *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir. 1991) and may do so in the absence of individualized suspicion. *Martinez-Fuerte*, 428 U.S. at 563-64 (1976).   A routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate. *United States v. Ludlow*, 992 F.2d 260, 263-64 (10th Cir. 1993).   Any detention beyond the scope of a routine checkpoint stop, however, must be based on reasonable suspicion, probable cause, or consent. *See Martinez-Fuerte*, 428 U.S. at 567; *Rascon-Ortiz*, 994 F.2d at 753.

For purposes of the Fourth Amendment, a dog sniff does not constitute a "search." *See United States v. Place*, 462 U.S. 696, 707 (1983).   Therefore, so long as the detention is lawful and does not exceed the scope of a routine check point stop, consent to conduct the dog sniff is not required. *See United States v. Massie*, 65 F.3d 843 (10th Cir. 1995) (Defendant's refusal of consent irrelevant where defendant was lawfully detained at the time dog alerted to the vehicle); *United States v. Chavira*, 9 F.3d 888, 890 n. 1 (10th Cir. 1993) (although consent is not required for a dog sniff of a lawfully detained vehicle even absent "individualized reasonable suspicion," it is required for continued detention beyond the lawful period).   A  canine alert on a vehicle gives rise to probable cause to search the vehicle. *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004).

Here, the entire encounter prior to Defendant's consent to conduct a dog sniff was brief and unintrusive.  This part of the encounter lasted approximately two minutes and involved routine check-point questions related to Defendant's citizenship, his travel plans, and car ownership. Such inquiries fell squarely within the scope of a routine check point stop as they were "reasonably related to the officer's duty to prevent the unauthorized entry of individuals into the United States and to prevent the smuggling of contraband."  *Rascon-Ortiz*, 994 F.3d at 752.

During the course of Defendant's brief detention at the primary inspection area, Agent Rocha observed what he considered to be suspicious circumstances. Agent Rocha's suspicions were initially aroused at the beginning of the encounter by Defendant's unusual demeanor: Defendant dominated the conversation, he was shuffling papers at the agent, speaking very rapidly and he was moving back and forth in his seat.  Agent Rocha testified that when people drive up to the checkpoint they usually wait for the agent to address them before engaging in any conversation with the agent.  Moreover, when Agent Rocha asked Defendant his citizenship, Defendant ignored the question and continued to talk about how he was lost and that he was trying to get to the "Rio Rancho Casino"-a casino that Agent Rocha knew did not exist.  Agent Rocha's suspicions were further aroused when Defendant stated that the vehicle was a rental.  Agent Rocha did not believe that the vehicle was a rental because it was not in very good condition.  It did not look like any other rental vehicle he had seen before.  It was an older model, it was missing a speaker and it didn't look as clean as a rental car.  On cross-examination, Agent Rocha testified credibly that he was not familiar with "rent-a-wreck" rental cars and that he had only rented from Enterprise, Hertz or Avis. In addition,  Agent Rocha observed a battery pack for charging the vehicle's battery on the floor of the vehicle.  When Agent Rocha asked Defendant to show him the rental agreement, Defendant said

7

that he did not have it. Because Defendant was unable to produce the rental car agreement, Agent Rocha's suspicions were further aroused. The Court finds that Agent Rocha's articulation of suspicious circumstances were supported by the facts. In light of his suspicions, Agent Rocha asked Defendant for permission to conduct a canine inspection and Defendant agreed. At that point in the encounter, Defendant's continued detention was based on his consent. At the moment Lisa alerted, the continued detention was additionally supported by probable cause.

Because Agent Rocha's brief and unintrusive questioning of Defendant fell within the scope of a routine checkpoint inquiry and was additionally supported by suspicious circumstances, Defendant's initial detention at the primary inspection area was lawful. Any further detention was based on Defendant's consent or probable cause. Therefore, the entire checkpoint stop was conducted in compliance with the Fourth Amendment.

## CONCLUSION

For the aforementioned reasons, the Court finds that Defendant's Fourth Amendment rights were not violated during the border patrol check point stop.

**WHEREFORE , IT IS ORDERED** that Defendant Woodruff's Motion to Suppress [Doc. 26] is **DENIED.**

Dated this 8th day of April, 2009.

MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Mark Saltman

Attorney for Defendant:
Mario Esparza

8